## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS LOCAL 1776 & PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ABBOTT LABORATORIES; ABBOTT RESPIRATORY LLC; ABBVIE, INC.; BARR PHARMACEUTICALS, LLC; BARR LABORATORIES, INC.; KOS PHARMACEUTICALS, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; and TEVA WOMEN'S HEALTH, f/k/a DURAMED PHARMACEUTICALS, INC.<br><br>Defendants. | Civil Action No.<br><br><br>CLASS ACTION<br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund ("Plaintiff" or "UFCW") brings this class action on behalf of itself and all others similarly situated against Defendants Abbott Laboratories, and Abbott Respiratory LLC (together, "Abbott"), AbbVie, Inc., ("AbbVie"); Kos Pharmaceuticals, Inc. ("Kos"); Barr Pharmaceuticals LLC, Barr Laboratories, Inc. (together "Barr"); Teva Pharmaceutical Industries Ltd, Teva Pharmaceuticals, USA, Inc., and Teva Women's Health (together, "Teva" and collectively, "Defendants"), and alleges as follows based on (a) personal knowledge; (b) the investigation of counsel; and (c) information and belief.

## I.       NATURE OF THE ACTION

1.       This is a civil antitrust action seeking treble damages arising out of Defendants'
anticompetitive scheme to exclude competition from the market for the prescription drug
Niaspan, which is the only extended-release version of niacin approved as a once-a-day
prescription therapy for treating mixed lipid disorders.  Niaspan is currently sold by AbbVie, and
was sold previously by predecessors-in-interest Abbott and Kos.  Defendants' anticompetitive
conduct has prevented less-expensive generic equivalents of Niaspan from entering the market to
the detriment of Plaintiff and the class of end-payors it seeks to represent (as defined below),
causing them to pay overcharges.

2.       The anticompetitive course of conduct described in this Complaint was set in
motion by two companies—Kos and Barr.  Niaspan was Kos' most important product,
comprising nearly two-thirds of Kos' annual sales at the outset of the unlawful conduct alleged
herein.  When Barr sought regulatory approval to launch a generic equivalent of Niaspan, Kos
sued Barr for patent infringement solely to obtain the automatic 30-month stay of Federal Food
and Drug Administration ("FDA") approval of Barr's product that resulted from such a suit.  By
the end of the 30-month regulatory stay period on March 30, 2005, Barr was ready and willing to
launch its extended-release niacin products immediately upon receiving final approval from the
FDA, which all parties (accurately) predicted would issue shortly after the stay expired.
Anticipating that the strength of its Niaspan patents would not prevent Barr's launch at the end of
the stay period, Kos was also ready to launch its own authorized generic Niaspan product in
competition with Barr.

3.       By mid-2005, Kos had already received the benefit of multiple overlapping 30-
month stays of final approval of Barr's generic, but Kos was desperate to further delay the drastic
loss of Kos' monopoly profits from its flagship Niaspan product that would have occurred

2

immediately upon Barr's launch.   Rather than let a court decide whether to enjoin Barr's launch—a decision that would have been based in large part on Kos' likelihood of success on the patent merits—Kos paid Barr to stay out of the market.

4.     Just days before generic Niaspan was to finally become available to purchasers, Kos and Barr reached an unlawful market allocation agreement pursuant to which Kos agreed to split its monopoly profits from Niaspan with Barr in exchange for Barr's agreement not to market its extended-release niacin product in competition with Niaspan for more than eight years (the "Exclusion Payment Agreement" or "Agreement").   Specifically:

   a.   Kos agreed to pay Barr tens of millions of dollars or more in exchange for Barr's commitment to delay bringing its competing generic equivalent of Niaspan to market until September 20, 2013 (or earlier under certain circumstances designed to ensure that no other generic company entered the market before Barr);

   b.   The payments to Barr included lump sum amounts (which Kos paid in 2005) and quarterly payments to be made so long as Barr delayed launching its generic equivalent of Niaspan (and Kos, Abbott and AbbVie have made those payments on a quarterly basis ever since 2005);

   c.   Although Kos and Barr cloaked the payments behind spurious supply and promotion agreements, the true purpose and effect of the payments was to induce Barr to delay competing with Kos;

   d.   Kos also agreed to provide substantial compensation to Barr by agreeing not to launch its own authorized generic version of Niaspan in competition with Barr's generic Niaspan product for at least the first 180 days after Barr's launch;

e.  In 2006, Abbott bought Kos, and Abbott continued to make payments to Barr (and its successor) in exchange for Barr continuing to delay competing with Niaspan under the Exclusion Payment Agreement;

f.  In 2008, Teva bought Barr, and Teva continued to receive payments from Abbott (and its successor) and continued to delay competing with its generic equivalent of Niaspan under the Exclusion Payment Agreement; and

g.  In 2013, Abbott diverted its prescription drug business to AbbVie, and AbbVie continued to make payments to Teva in exchange for Teva continuing to delay competing with its generic equivalent of Niaspan under the Exclusion Payment Agreement.

5.  Although the Exclusion Payment Agreement purported to settle the patent infringement suits between Kos and Barr, Kos used the strength of its wallet as opposed to the strength of its patents to obtain Barr's agreement not to launch its generic Niaspan products.  Kos agreed to share its monopoly profits with Barr as the quid pro quo for Barr's agreement not to compete with Kos in the extended-release niacin market until September 20, 2013.  Each of the successor companies to Kos and Barr have also shared in the monopoly profits derived from the artificially-inflated Niaspan prices caused by the delay.

6.  Moreover, Defendants knew and intended that the Agreement would also prevent other generic companies from launching their own generic Niaspan before Barr/Teva did, thereby creating a bottleneck.  As the first filer of a qualifying Abbreviated New Drug Application ("ANDA"), Barr/Teva is entitled to market its generic Niaspan for 180 days free from competition from other generic Niaspan products.  The Agreement blocks any other generic Niaspan products from coming to market until 180 days after September 20, 2013 because FDA

will not approve subsequently-filed ANDAs until the first-filer's exclusivity has run, which will not occur until 180 days after Barr/Teva launches.  Thus, by intentionally employing Barr's un-triggered 180-day exclusivity—a provision designed to incentivize earlier ANDA filing in order to *speed* generic entry—the Agreement has delayed not just Barr's launch, but has also delayed the marketing of any other generic versions of Niaspan (as well as deterred the early filing of other generic Niaspan ANDAs that generic companies had not yet submitted).  Kos/Abbott has also engaged in various acts and practices, discussed below, to prevent any other generic company from dislodging the approval bottleneck created by the Agreement.

7.      Defendants' scheme has worked as planned. Barr/Teva did, in fact, delay marketing its less expensive generic version(s) of Niaspan; but for the Exclusion Payment Agreement, at least two generic extended-release niacin products would have been available to Plaintiff and the Class as early as March 31, 2005, when Barr would have launched upon receiving final FDA approval of its generic Niaspan products and Kos would have been on the market with its authorized generic Niaspan products in competition with Barr.  Thus, absent the unlawful Exclusion Payment Agreement, Plaintiff and the members of the Class would have been able to purchase, and would have purchased less expensive generic versions of extended-release niacin, rather than being forced to pay high prices for branded Niaspan.

8.      Defendants' unlawful Exclusion Payment Agreement was designed to and did in fact: (a) preclude the entry of less expensive generic versions of extended-release niacin in the United States for more than 8 years; (b) fix, raise, maintain or stabilize the price of extended-release niacin products; (c) permit Kos and its successor companies to maintain a monopoly in the United States for extended-release niacin; and (d) allocate 100% of the United States

extended-release niacin market to Kos and its successor companies so that the conspiring would-be competitors could divide the illegitimate monopoly profits.

9.     As planned, generic Niaspan has not entered the market, and it is not likely to enter the market until September 20, 2013 at the earliest.   Because of the ongoing anticompetitive and unlawful conduct described in this Complaint, competition from low-cost generic versions of Niaspan has been precluded since early-2005 and the injury Plaintiff and the Class has suffered continues through today.   Because of Defendants' scheme to delay generic competition for Niaspan, Plaintiff and the Class have paid at least hundreds of millions of dollars more for extended-release niacin than they would have paid absent such conduct.

10.     This action is brought as a class action on behalf of all consumers and third-party payors (collectively the "End-Payor Class") in the States and the District of Columbia and Puerto Rico who purchased or paid for branded and/or generic Niaspan products, other than for re-sale, since March 31, 2005 (see Class Definition below).   Plaintiffs seek a judgment declaring that the Exclusion Payment Agreement, as further described below, is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1.   Plaintiffs also seek an injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining the continuation of the anti-competitive Agreement. Unless enjoined, Defendants' unlawful conduct will continue unchecked and Plaintiff and the End-Payor Class will continue to bear the financial brunt of Defendants' antitrust violations. Plaintiff also asserts claims for compensatory and/or treble damages and equitable relief for continuing violations of the State laws enumerated below.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, there are more than one hundred members of the

Class, and at least one member of the putative Class is a citizen of a state different from that of one of the Defendants.

12.     This Court also has jurisdiction over this matter pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337 in that Plaintiff brings claims under Section 16 of the Clayton Act, 15 U.S.C. § 26, for injunctive and equitable relief to remedy Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.

13.     This Court has jurisdiction over the Defendants because they are present in the United States, they do business in the United States, they have registered agents in the United States, they may be found in the United States, and/or they are otherwise subject to the service of process provisions of 15 U.S.C. § 22.

14.     Venue is appropriate within this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §1391(b) and (c), because Defendants transact business within this District, and because the interstate trade and commerce, hereinafter described, is carried out, in substantial part, in this District.

## III.     PARTIES

15.     Plaintiff United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund ("Plaintiff" or "UFCW") maintains its principal place of business at 3031-A Walton Road, Plymouth Meeting, Pennsylvania 19462.  Plaintiff has purchased and/or provided reimbursement for some or all of the purchase price for Niaspan, other than for re-sale (and will purchase generic Niaspan other than for re-sale once it becomes available) in Arizona, Delaware, Florida, Maine, New Jersey, Pennsylvania and South Carolina at supra-competitive prices during the Class Period, and has thereby been injured.

16.     Defendant Abbott Laboratories is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064.  Abbott Laboratories is a global health care company that is engaged in the production, marketing and distribution of pharmaceutical products throughout the United States.

17.     Defendant Abbott Respiratory LLC ("Abbott Respiratory") is a limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064.  Abbott Respiratory was a wholly-owned subsidiary of Kos Pharmaceuticals, Inc., and is now a wholly-owned subsidiary of Abbott Laboratories.  Abbott Respiratory is the exclusive licensee of various patents that purport to cover Niaspan and/or a method of using Niaspan.   Abbott Laboratories, and Abbott Respiratory LLC (together, "Abbott") directly and independently participated in the conduct alleged herein.

18.     Defendant AbbVie, Inc. ("AbbVie") is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business at 1 North Waukegan Road, North Chicago, Illinois.  On information and belief, on or about on January 1, 2013, Abbott delegated most of its pharmaceuticals operations to AbbVie. AbbVie is a global biopharmaceutical company that is engaged in the production, marketing and distribution of pharmaceutical products throughout the United States.   AbbVie directly and independently participated in the conduct alleged herein.

19.     Defendant Kos Pharmaceuticals, Inc. ("Kos") is a corporation organized under the laws of the state of Florida, with its principal place of business at 1 Cedar Brook Drive, Cranbury, New Jersey.  In December of 2006, Abbott acquired Kos in a stock-purchase merger, whereby Kos became a wholly-owned subsidiary of Abbott.

20.      Defendant Barr Pharmaceuticals, LLC is a corporation organized under the laws of the State of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677.

21.      Defendant Barr Laboratories Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 225 Summit Avenue, Montvale, New Jersey 07645.   Barr Laboratories, Inc. operates as a subsidiary of Barr Pharmaceuticals, Inc., following a merger in 2003.

22.      Barr Pharmaceuticals, LLC, Barr Pharmaceuticals, Inc. and Barr Laboratories, Inc. are referred to collectively as "Barr."   In 2001, Barr acquired Duramed Pharmaceuticals ("Duramed") in a merger whereby each share of Duramed common stock was converted into the right to receive a fractional share of Barr common stock plus cash.   Subsequent to the merger, Duramed became a wholly owned subsidiary of Barr and was delisted from the Nasdaq National Market.   Under the Agreement, Duramed was designated a co-promoter of Niaspan and Advicor to obstetricians, gynecologists and other doctors focusing on women's healthcare.   In 2008, Teva acquired Barr in a tax-free transaction, whereby each share of Barr common stock was converted into the right to receive a fractional share of Teva stock plus cash.   On December 23, 2008, Barr became a wholly-owned subsidiary of Teva and ceased to be traded on the New York Stock Exchange. Duramed then became known as Teva Women's Health.

23.      Defendant Teva Pharmaceutical Industries, Ltd. ("Teva Industries") is an Israeli corporation having its principal place of business at 5 Basel St, P.O. Box. 3190, Petach Tikva 49131, Israel.

24.      Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation, having a principal place of business at 1090 Horsham Road, P.O. Box 1090, North

Wales, Pennsylvania 19454.  Teva USA is a wholly-owned subsidiary of Teva Pharmaceutical Industries, Ltd.  Upon information and belief, Teva USA manufactures and/or distributes generic drugs for sale and us throughout the United States and in this judicial district at the direction, under the control, and for the direct benefit of Teva Industries.

25.     Defendant Teva Women's Health, formerly known as Duramed Pharmaceuticals, Inc., is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey 07677. Teva Women's Health products are produced under the Duramed Pharmaceuticals, Inc. label in the U.S. and Canada.  Duramed was a corporation organized under the laws of the state of Delaware, with its principal place of business at 400 Chestnut Ridge Road, Woodcliff Lake, New Jersey.  Until 2008, Duramed was a subsidiary of Barr.  In 2008, when Teva purchased Barr, Duramed became a subsidiary of Teva.  In September 2009, following Teva's acquisition of Barr, Duramed changed its name to Teva Women's Health, Inc.

26.     Defendants Teva Industries, Teva Women's Health and Teva USA (collectively, "Teva") are the largest generic manufacturers of pharmaceuticals in the world.  Following Teva's acquisition of Barr, Teva directly and independently participated in the conduct alleged herein.

27.     All of Defendants' actions described in this Complaint are part of, and in furtherance of, the illegal restraint of trade alleged herein, and were authorized, ordered, and/or performed by Defendants' various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs, within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of Defendants.

IV.     **CLASS ACTION ALLEGATIONS**

28.     Plaintiff brings this action on behalf of itself and, under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), as representative of a Class defined as follows:

> All persons or entities in the United States, the District of Columbia and Puerto Rico who purchased and/or paid for some or all of the purchase price for Niaspan, in any form, for consumption by themselves, their families, or their members, employees, insureds, participants, or beneficiaries (the "Class"), other than for resale, during the period March 31, 2005 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period"). For purposes of the Class definition, persons or entities "purchased" Niaspan if they paid or reimbursed some or all of the purchase price.

29.     The following persons or entities are excluded from the proposed class:

a.   Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal government entities, except for government funded employee benefit plans;

b.   All persons or entities who purchased Niaspan for purposes of resale or directly from Defendants or their affiliates;

c.   Fully insured health plans (i.e., plans that purchased insurance from another third-party payor covering 100% of the Plan's reimbursement obligations to its members);

d.   Flat co-payers (*i.e.*, consumers who paid the same co-payment amount for brand and generic drugs); and

e.   The judges in this case and any members of their immediate families.

30.     Members of the Class are so numerous that joinder is impracticable. Plaintiff believes that there are hundreds of thousands of Class members.

31.     Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants, i.e.,

they paid artificially inflated prices for Niaspan and were deprived of the benefits of earlier and more robust competition from cheaper generic equivalents of Niaspan as a result of the Defendants' wrongful conduct.

32.     Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

33.     Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation, and with particular experience with class action antitrust litigation involving pharmaceutical products.

34.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making overcharge damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

35.     Questions of law and fact common to the Class include:

a.   whether Kos, Abbott and/or AbbVie entered into a contract, combination, and/or conspiracy with Barr and/or Teva to restrain trade and, if so, whether it should be evaluated under the rule of per se illegality, the "rule of reason," or some other rule or standard;

b.   whether Defendants unlawfully excluded competitors and/or potential competitors from the market for Niaspan;

c.   whether Defendants unlawfully delayed or prevented generic manufacturers from coming to market in the United States;

d.   whether the activities of Defendants as alleged herein have substantially affected interstate commerce;

e.   whether, and to what extent, Defendants' conduct caused antitrust injury (i.e., overcharges) to Plaintiff and the members of the Class; and

f.   the quantum of aggregate overcharge damages to the Class.

36.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy.   Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.   The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in the management of this class action.

37.     Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

V.     **BACKGROUND REGARDING THE GENERIC DRUG APPROVAL PROCESS**

A.     **Characteristics of the Prescription Pharmaceutical Marketplace**

38.     The marketplace for the sale of prescription pharmaceutical products in the United States suffers from a significant imperfection that brand manufacturers can exploit in order to obtain or maintain market power in the sale of a particular pharmaceutical composition. Markets function best when the person responsible for paying for a product is also the person who chooses which product to purchase.   When the same person has both the payment obligation and the choice of products, the price of the product plays an appropriate role in the person's

choice of products and, consequently, the manufacturers have an appropriate incentive to lower the prices of their products.

39.     The pharmaceutical marketplace, however, is characterized by a "disconnect" between the payment obligation and the product selection.  State laws prohibit pharmacists from dispensing many pharmaceutical products, including Niaspan, to patients without a prescription written by a doctor.  The prohibition on dispensing certain products without a prescription introduces a disconnect between the payment obligation and the product selection.  The patient (and in most cases his or her insurer) has the obligation to pay for the pharmaceutical product, but the patient's doctor chooses which product the patient will buy.

40.     Brand manufacturers exploit this price disconnect by employing large forces of sales representatives to visit doctors' offices and persuade them to prescribe the manufacturer's products.  These sales representatives do not advise doctors of the cost of the branded products.  Moreover, studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are insensitive to price differences because they do not have to pay for the products.  The result is a marketplace in which price plays a comparatively unimportant role in product selection.

41.     The relative unimportance of price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand—the extent to which unit sales go down when price goes up.  This reduced price elasticity in turn gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable.  The ability to profitably raise price substantially above marginal cost is what economists and antitrust courts refer to as market power.  The result of the market

imperfections and marketing practices described above is to allow brand manufacturers to gain and maintain market power with respect to many branded prescription pharmaceuticals.

      **B.**      **Generic Versions of Brand Drugs are Significantly Less Expensive, and Take Significant Sales Directly From the Corresponding Brand Versions**

      42.      Typically, generic versions of brand drugs are priced significantly below the brand versions. Because of the price differentials, and other institutional features of the pharmaceutical industry, generic versions are liberally and substantially substituted for their brand counterparts. In particular, generic drugs that are pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to their brand name counterparts are given an "AB" rating by the FDA. Pharmacists substitute a less-expensive AB-rated generic product for the corresponding brand product unless the doctor has indicated that the prescription for the brand product must be "dispensed as written." As more generic manufacturers enter the market, prices for generic versions of a drug predictably decrease even further because of competition among the generic manufacturers, and the loss of sales volume by the brand drug to the corresponding generics accelerates.

      43.      All states permit (and some states require) pharmacists to automatically substitute an AB-rated generic drug for the corresponding brand name drug unless the doctor has stated that the prescription for the brand name product must be dispensed as written.

      44.      Many third party payors (such as health insurance plans and Medicaid programs) have adopted policies to encourage the substitution of AB-rated generic drugs for their branded counterparts. In addition, many consumers routinely switch from a branded drug to an AB-rated generic drug once the generic becomes available. Consequently, AB-rated generic drugs typically capture a significant share of their branded counterparts' sales, causing a significant reduction of the branded drug's unit and dollar sales.

45.     Once a generic equivalent hits the market, the generic quickly captures sales of the brand drug, often capturing 80% or more of the market within the first six months.  About one year after market entry, the generic version often takes over 90% of the brand's unit sales and sells for 15% of the price of the brand name product.

46.     Generic competition enables purchasers at all levels of the pharmaceutical supply chain, including all members of the proposed Class to: (a) purchase generic versions of a drug at substantially lower prices; and/or (b) purchase the brand drug at a reduced price.  However, until a generic manufacturer enters the market, there is no bioequivalent generic drug to compete with the brand drug, and therefore the brand manufacturer can continue to profit from supracompetitive pricing, without losing its brand sales.   Consequently, brand drug manufacturers have a strong incentive to use various tactics, including those alleged above, to delay the introduction of generic competition into the market.

47.     Brand manufacturers are well aware of generics' rapid erosion of their previously monopolized market.  Brand manufacturers thus seek to extend their monopoly for as long as possible, sometimes resorting to any means possible — including illegal means.

**C.      Congress Intended to Expedite the Availability of Low-Cost Generic Drugs Through the Hatch Waxman Amendments**

48.     Under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. §§ 301-392) ("FDCA"), manufacturers that create a new drug must obtain the approval of the FDA to sell the new drug by filing a New Drug Application ("NDA").  An NDA must include submission of specific data concerning the safety and effectiveness of the drug, as well as any information on applicable patents.

49.     In 1984, Congress amended the FDCA with the enactment of the Hatch-Waxman amendments, called the Drug Price Competition and Patent Term Restoration Act, Pub. L. No.

16

98-417, 98 Stat. 1585 (1984) ("Hatch-Waxman"). Through Hatch-Waxman, Congress sought to expedite the market entry of generic drugs, thereby reducing healthcare expenses nationwide.

50.     Hatch-Waxman simplified the regulatory hurdles for prospective generic manufactures by eliminating the need for them to file a lengthy and costly NDA in order to obtain approval.  Instead, a generic manufacturer seeking approval to sell a generic equivalent of a brand name drug may file an Abbreviated New Drug Application ("ANDA").  If an ANDA applicant shows that the generic drug contains the same active ingredient(s), dosage form, route of administration, and strength as the brand name drug — that is, that the generic drug is "bioequivalent" to the brand name drug — then the ANDA may rely on the scientific safety and effectiveness findings included in the brand name drug manufacturer's original NDA.

51.     The FDCA and Hatch-Waxman Amendments proceed from the fact that bioequivalent drug products are therapeutically equivalent and may be substituted for one another when the products: (1) contain identical amounts of the same active ingredients in the same route of administration and dosage form; (2) meet applicable standards of strength, quality, purity and identity; (3) are manufactured in compliance with current good manufacturing practices regulations; and (4) are adequately labeled.  Bioequivalence demonstrates that the active ingredient of the proposed generic drug would be present in the blood of a patient to the same extent and for the same amount of time as the brand counterpart.

### 1.     Generic Drugs Must Be Bioequivalent to Their Brand Counterparts.

52.     The Hatch-Waxman Amendments created section 505(j) of the FDCA and established the current ANDA approval process. To obtain approval, an ANDA applicant is not required to submit evidence on the clinical safety and effectiveness of the drug product; instead, an ANDA relies on the FDA's previous finding that the reference listed drug (or "RLD," the brand drug) is safe and effective.  To rely on a previous finding of safety and effectiveness, an

ANDA applicant must demonstrate, among other things, that its drug product is bioequivalent to the RLD. In addition, an ANDA must contain, with certain exceptions not relevant here, information to show that the proposed drug has the same active ingredient(s), indications of use, route of administration, dosage form, strength, and labeling as the RLD. The FDA must approve an ANDA unless the information submitted in the ANDA is insufficient to meet the requirements delineated in § 505(j)(2)(A) of the Act, including a demonstration of bioequivalence.

> **2.    To Facilitate Early Resolution of Patent Disputes, Generic Companies Must Certify That Their Product Will Not Infringe Any Valid Patents Listed in The Orange Book.**

53.    When the FDA approves a brand name manufacturer's NDA, the brand manufacturer is permitted to list all patents that could reasonably be asserted against a generic manufacturer who makes, uses, or sells a generic equivalent of the brand drug in the FDA's book of Approved Drug Products with Therapeutic Equivalence Evaluations, known as the "Orange Book." New patents obtained after NDA approval must be listed in the Orange Book as related to the NDA if the new patent claims either the approved drug (for compound patents) or approved methods of use for the approved drug (for method-of-use patents).  The NDA holder is required to file information on any such patent with the FDA within thirty days of the patent's issuance.

54.    The FDA does not have the resources or authority to evaluate the patents submitted by brand manufacturers, but instead relies solely on the brand name manufacturer's representations about patent validity and applicability.  Thus, in listing patents in the Orange Book, the FDA performs a purely ministerial act, and does not review the propriety of listing the patent in the Orange Book.

55.    To obtain FDA approval, an ANDA applicant must provide one of several certifications to the FDA and the patent holder regarding patents and other exclusivities covering the brand product. First, the generic manufacturer must certify that the generic drug will not

infringe patents covering the drug, as listed in the Orange Book, because (I) no patents exist on the brand product; (II) any listed patents will have expired by the time the product comes to market; (III) the generic product will not come to market until the listed patents expire; or (IV) the listed patents are invalid or will not be infringed by the sale of the generic product. The last certification, that the patents are invalid or not infringed, is known as a "Paragraph IV Certification."

56.     If a generic manufacturer files a Paragraph IV certification, it constitutes a technical act of infringement under the Hatch-Waxman Amendments — even though the generic product is not yet on the market.[1] Congress enacted this provision to speed the entry of generic drugs by allowing brand and generic manufacturers to resolve potential patent disputes while the ANDAs are pending review by FDA.  To offset the benefit generics received by being able to resolve their patent disputes and come to market earlier, Hatch-Waxman provides a benefit to brand companies: if the brand manufacturer sues within 45 days of receiving notification of the Paragraph IV certification, the FDA is blocked from granting final approval to the ANDA until the earlier of:  (a) the passage of thirty months; or (b) the issuance of a decision by a court that the patent is invalid or not infringed by the generic manufacturer's ANDA. The 30-month stay is available to the brand without regard to the merits of the patent suit.  FDA may grant an ANDA tentative approval when it determines that the ANDA would otherwise be ready for final approval but for the 30-month stay.

57.     Before the enactment of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") on December 8, 2003, a brand manufacturer could obtain a

---

[1] Although filing a Paragraph IV certification is a technical act of infringement under the statute, a patent holder that brings an infringement suit must still prove infringement on the merits to succeed in litigation.

separate 30-month stay for each patent that it listed in the Orange Book, so long as it sued the generic manufacturer within the requisite 45 days. Brand manufacturers quickly discovered that by obtaining and listing patents seriatim, rather than all at once, they could exploit Hatch-Waxman to effectively extend the length of the automatic stay on generic competition well beyond 30 months.  To put a stop to this abusive practice, which was at cross purposes with Hatch-Waxman's goal of speeding generic entry, MMA amended Hatch-Waxman to clarify that for all patents submitted on or after August 18, 2003, brand manufacturers would only be entitled to one 30-month stay, and would not be entitled to extend their regulatory protection using multiple stays arising from "late listed" patents.

58.    Congress also sought to incentivize generic companies to seek approval of generic alternatives to branded drugs and challenge weak patents. Hatch-Waxman grants to the first generic manufacturer to file a substantially complete ANDA containing a Paragraph IV certification to at least one Orange Book-listed patent (a "first filer") a 180-day period of market exclusivity ("180-day exclusivity"), during which the first filer enjoys temporary freedom from competition with other generic versions of the drug approved via ANDA.

59.    Where the first ANDA with a Paragraph IV certification was filed pre-MMA and where 180-day exclusivity had not been triggered before that date (as is the case with Barr's Niaspan ANDA in this case), a first filer's 180-day exclusivity period may only be "triggered" by the earlier of (a) the first-filer's actual commercial launch (this triggers 180-day exclusivity for every Paragraph IV certification, i.e., to all patents at once); or (b) a court decision of invalidity or non-infringement from which no appeal other than to the Supreme Court can be taken (which triggers the 180-day exclusivity only with respect to the individual patent covered by such

decision, on a patent-by-patent basis).  Until the first filer's 180-day exclusivity is triggered, and

expires, FDA cannot issue approval to any subsequently-filed ANDAs.[2]

### D.   Drug Manufacturers "Game" The Regulatory Scheme Governing the Approval of Generic Drugs

#### 1.   Abuse of the 30-month stay provision

60.   Brand name manufacturers can "game the system" by listing patents in the

Orange Book (even patents that are technically not eligible for listing) and then suing any

generic competitor that files an ANDA with a Paragraph IV certification (even if the patent is

clearly invalid, or the generic's product non-infringing) in order to obtain the automatic 30-

month stay and delay final FDA approval of the ANDA for up to two and a half years.  That

brand name manufacturers often sue generics under Hatch-Waxman simply to delay generic

competition—as opposed to enforcing valid patents that are actually infringed by the generic—is

demonstrated by the fact that generic firms have prevailed in Paragraph IV litigation, by

obtaining a judgment of invalidity or non-infringement or by the patent holder's voluntary

dismissal, in 73% of the cases studied.

61.   Moreover, before Congress passed the MMA, brand manufacturers could further

abuse Hatch-Waxman by listing multiple patents in the Orange Book—even long after an ANDA

had been filed—and thereby obtain a separate, later-expiring stay on generic competition for

each newly listed patent, effectively extending the stay for substantially longer than 30 months.

---

[2] With enactment of MMA in 2003, Congress replaced the provisions that governed the triggering of 180-day exclusivity with provisions that provide for the forfeiture of 180-day exclusivity period under certain circumstances. The MMA's 180-day forfeiture provisions do not apply to drugs for which a Paragraph IV ANDA had been filed before the December 2003 enactment of the MMA. Because Barr filed the first Paragraph IV ANDA to Niaspan in 2002, the MMA's 180-day forfeiture provisions do not apply.

      **2.**   **Conspiracy between the brand manufacturer and first filer to "park" the 180-day generic exclusivity period and create a "bottleneck" to block all other generic entrants**

62.    A first filer that joins forces with the brand manufacturer can help "game the system" by delaying not only its own market entry, but also by using its 180-day exclusivity to effectively block competition from all subsequent generic companies.

63.    Specifically, the first generic applicant, by agreeing not to begin marketing its generic drug, delays the start of its 180-day period of generic market exclusivity, a tactic called exclusivity "parking." This tactic creates a "bottleneck" because subsequent generic applicants cannot launch until the first generic applicant's 180-day exclusivity has elapsed. Even for generic manufacturers that are no longer subject to an automatic 30-month stay, are otherwise approvable, and are ready, willing, and able to launch at risk, the first filer's "parked" exclusivity effectively blocks the market entry of subsequent generics until 180 days after the date the first filer is permitted to enter under the exclusion payment agreement.

64.    Where the first filer delays the start of the commercial launch trigger, the only way for subsequent generic companies to trigger, or "un-park," the running of the first-filer's 180-day exclusivity period was to obtain an appellate decision of invalidity or non-infringement with respect to all patents that were the subject of the first filer's Paragraph IV certification.

65.    However, the brand manufacturer and first filer frequently take various steps to fortify the bottleneck by making it less economically viable for subsequent filers to trigger the first filer's exclusivity. For instance, exclusion payment agreements often include terms allowing the first filer to launch before its agreed entry date in the event that a subsequent filer does so. The co-conspirators disclose these terms publicly, thus broadcasting to any subsequent filer that even if they incur the substantial expense involved in dislodging the bottleneck, they will be guaranteed to face competition from at least the first filer, and likely others. By

eliminating the possibility for de facto exclusivity these agreements deter subsequent filers from attempting to obtain a court decision that would break the bottleneck.  Similarly, where a first filer has "parked" its 180-day exclusivity, subsequent filers have comparatively little to gain by obtaining a court decision of invalidity and/or non-infringement and are therefore willing to settle for much less time on the market that they otherwise would have.

### 3.   No Authorized Generic Agreements

66.    An authorized generic drug is chemically identical to the brand name drug, but marketed and sold as a generic product under the branded product's original NDA.  Brand name companies are permitted to, and frequently do, launch authorized generics to compete with first-filing generics and regain a portion of the profits they would otherwise lose to generic competition during the 180-day exclusivity period.  Competition between the authorized generic and the first-filing generic during the 180-day exclusivity period lowers prices for consumers and other drug purchasers.

67.    Authorized generics have a significant negative impact on a first-filing generic's revenues.  In an August 2011 report issued by the Federal Trade Commission ("FTC"), Authorized Generic Drugs: Short-Term Effects and Long-Term Impact, the FTC concluded, after analyzing documents and empirical data from more than 100 companies, that authorized generics reduce a first-filer's revenues by approximately 50 percent during the generic's most lucrative 180-day exclusivity period.  The negative effects of an authorized generic on the first-filer also continue well after exclusivity expires, as the FTC found that revenues of the first-filer generic in the 30 months following exclusivity are between 53 percent and 62 percent lower when facing an authorized generic.  The FTC also concluded that wholesale and retail prices decrease when the first-filer competes with an authorized generic. Thus, when a brand company agrees to not to launch an authorized generic in exchange for a generic company's agreement to delay market

entry, the brand company confers a substantial benefit on the generic, because without competition from an authorized generic, the generic doubles the volume of its sales, and is able to charge higher prices absent competition from the authorized generic.

68.     The FTC agrees that, because freedom from an authorized generic is extremely valuable to first-filing generics, promises not to compete with generic entrants by marketing an authorized generic are a form of consideration paid by brand manufacturers to generics in exchange for the generics' agreement to delay market entry.  Although a brand company will lose some product revenue and profits from agreeing not to market an authorized generic, it makes far more in branded profits and sales by paying a generic to delay market entry with the no-authorized generic agreement. Thus, both the brand and generic companies reap greater revenues and profits under no-authorized generic agreements.

69.     However, all of this comes at the expense of consumers and other purchasers that are forced to pay higher prices both (1) during the period in which the generic has agreed to delay its launch (when purchasers must buy the more expensive brand drug instead of the less expensive generic version that would have been available absent the pay-for-delay agreement) and (2) during the first 180 days after the generic company finally and belatedly launches is generic drug (when purchasers are forced to pay more for the generic drugs they buy than they would have in a more competitive market, absent the brand company's agreement refrain from launching and authorized generic and instead allocate the entire generic market to the first filer during that period).

70.     No-authorized generic agreements come in many forms.  They are commonly structured as an "exclusive license" under which the brand company agrees to grant the first-filing generic exclusivity to market its generic product during the 180-day exclusivity period.

For a generic company which is first to file an ANDA on a high selling drug like Niaspan the difference between selling the only generic product and having to compete with an authorized generic can amount to hundreds of millions of dollars or more.  These economic realities, as confirmed and presented by the FTC in its 2011 authorized generic report, are well known in the pharmaceutical industry, and thus "no authorized generic" agreements are a common means by which brand companies confer a payment to generic companies in exchange for agreement to delay generic entry.

71.     Given the enormous financial importance to Kos of the revenue generated by Niaspan, which alone accounted for well over half of Kos' entire annual revenue, Kos and its successors in concert with Barr and its successors successfully executed an anticompetitive scheme that employed every one of the anticompetitive tools discussed above, as described in more detail below.

## VI.    FACTS

### A.    Kos Develops Niaspan and Reaps Substantial Profits.

72.     Niacin, the active ingredient in Niaspan, is Vitamin B-3.  It was discovered in the late 1800s/early 1900s, appears naturally in many foods, and started being sold as a dietary supplement in the United States no later than the 1930s.  In proper dosages, niacin will raise levels of HDL cholesterol (the so-called "good" cholesterol) in patients.  However, at high levels, niacin causes a patient's skin to flush with redness, and it may cause liver toxicity.

73.     In the 1990s, Kos set out to develop a time-release version of niacin, which could avoid the side effects associated with high dosages of niacin, and which could be marketed as a once-a-day therapy to boost HDL cholesterol in patients who needed treatment for cholesterol levels.  Eventually, Kos developed Niaspan, a time-release version of niacin, which it intended to market as a brand name prescription drug.  Kos did not claim to have discovered that niacin

reduces cholesterol (that scientific fact was documented in the 1950s), and was not the first company to make a sustained release niacin formulation.

74.     Kos was unable to patent the active ingredient in Niaspan under a compound patent, because niacin was not an innovative chemical compound.  However, Kos sought and eventually obtained a series of patents which it submitted to FDA, seriatim, for listing in the Orange Book as purportedly covering the formulation and method-of-use for Niaspan.  The Orange Book-listed patents for Niaspan at the time of the Agreement were as follows:

> Patent No. 6,080,428 (the "'428 patent")
> Patent No. 6,129,930 (the "'930 patent")
> Patent No. 6,406,715 (the "'715 patent")
> Patent No. 6,676,967 (the "'967 patent")
> Patent No. 6,746,691 (the "'691 patent")
> Patent No. 6,818,229 (the "'229 patent")

75.     In addition, on January 9, 2002, Kos purchased Patent Nos. 5,126,145 (the "'145 patent") and 5,268,181 (the "'181 patent") but did not list those patents in the Orange Book in connection with Niaspan.  Together, the '428, '930, '715, '967, '691, '229, '145 and '181 patents are referred to herein as the "Niaspan patents."

76.     Kos filed NDA 20-381 seeking FDA approval to market Niaspan, and on July 28, 1997, Kos received FDA approval to market Niaspan for the treatment of mixed lipid disorders. In September of 1997, Kos went to market with Niaspan, eventually selling Niaspan in dosages of 500 mg, 750 mg, and 1000 mg.

77.     Niaspan was, and still is, the only FDA-approved once-a-day prescription formulation of extended release niacin available for treating mixed lipid disorders. Kos and its successor companies market Niaspan as providing the first niacin therapy that delivers all of the desired effects on cholesterol levels, while at the same time, minimizing or eliminating the

adverse effects associated with earlier niacin formulations.  Other drugs prescribed for the treatment of mixed lipid disorders are not AB-rated to Niaspan, cannot be automatically substituted for Niaspan by pharmacists, do not exhibit substantial cross-price elasticity of demand with respect to Niaspan, and thus are not economic substitutes for, nor reasonably interchangeable with, Niaspan.

78.     Because of its unique position, doctors prescribed Niaspan often, and the drug quickly became Kos' most important product.  Nearly all of Kos' sales revenue was derived from sales of Niaspan.  Specifically:

    a.  In 2001, Kos sold $87 million of Niaspan, which accounted for 100% of the company's sales revenue.

    b.  In 2002, Kos sold $146 million of Niaspan, which accounted for 84% of the company's sales revenue.

    c.  In 2003, Kos sold $226 million of Niaspan, which accounted for 77% of the company's sales revenue.

    d.  In 2004, Kos sold $319 million of Niaspan, which accounted for 64% of the company's sales revenue.

    e.  In 2005, Kos sold $435 million of Niaspan, which accounted for 57% of the company's sales revenue.

79.     One of Kos' only other products in 2005 was Advicor, which is a combination product consisting of extended-release niacin (Niaspan) and lovastatin.  Kos derived 80% of its revenues from Niaspan and Advicor at the time of the Exclusion Payment Agreement.

**B.      Barr Seeks FDA Approval to Market Generic Niaspan and Kos Sues Barr.**

80.     After conducting extensive due diligence concerning potential infringement or invalidity of the patents Kos had listed in the Orange Book as covering Niaspan, on October 2,

2001, Barr submitted ANDA No. 76-250 seeking FDA approval to market 1000mg generic Niaspan extended-release tablets.  On January 23, 2002, Kos received notice that Barr had filed its ANDA with a Paragraph IV certification that the commercial manufacture, use and/or sale of its generic Niaspan product would not infringe any valid claim of the '428 and '930 patents, the only Orange Book-listed patents for Niaspan at that time.

81.    As a result, on March 4, 2002, Kos filed a patent infringement lawsuit against Barr in the Southern District of New York ("SDNY") asserting that Barr infringed the '428 and '930 patents.  On March 25, 2002, Barr answered the amended complaint by denying that the '428 and '930 patents are valid and infringed, and seeking a declaratory judgment to that effect. On August 19, 2002, Barr amended its answer to add counterclaims requesting a declaratory judgment that the '145 patent and the '181 patent are not infringed, and that the '181 patent is invalid.

82.    On March 21, 2002, Barr submitted ANDA No. 76-378 seeking FDA approval to market 500mg and 750mg generic Niaspan extended-release tablets.  On July 8, 2002, Kos received notice that Barr had filed its ANDA with a Paragraph IV certification that its products would not infringe any valid claim of the Orange Book listed patents for Niaspan.

83.    On August 13, 2002, Kos filed a second patent infringement lawsuit against Barr in the SDNY asserting that Barr's 500mg and 750mg generic Niaspan products infringed the '428 and '930 patents. On September 3, 2002, Barr answered the complaint by denying infringement and alleging that the patents are invalid. Barr also sought a declaratory judgment that the '428, '930, '145, and '181 patents were not infringed, and that the '428, '930, and '181 patents are invalid.  Barr represented in its Answer that it "intend[ed] to market its ANDA

product immediately upon receiving FDA approval." The two cases were consolidated on September 23, 2002.

84.    On September 30, 2002, Kos received notice from Barr that it had filed a Supplemental Paragraph IV Certification relating to the newly-listed '715 patent. Kos filed a third lawsuit on November 12, 2002 against Barr in the SDNY asserting infringement of this patent. On December 3, 2002, Barr answered the complaint by denying that the '715 patent is valid and infringed, and seeking a declaratory judgment of invalidity. Barr also sought a declaratory judgment that the '428, '930, '145, and '181 patents are not infringed, and that the '428, '930 and '181 patents are invalid. The third case was consolidated with the first two on January 23, 2003.  On March 4, 2003, Kos answered Barr's declaratory judgment counterclaims by denying that Kos' patents are invalid or not infringed and also sought a declaratory judgment that one or more of Barr's products will infringe the '145 and '181 patents.

85.    Because Kos submitted information on the '428, '930 and '715 patents to FDA for Orange Book listing before August 18, 2003, after which date amendments to the Hatch-Waxman Act prohibited multiple 30-month stays, each of the above three lawsuits resulted in an automatic 30-month stay of FDA approval of Barr's generic Niaspan ANDAs.  Thus, although Kos received Barr's first Paragraph IV notification on January 23, 2002, the operation of the multiple 30-month stays meant that Barr's ANDAs would not be eligible to receive FDA approval until March 30, 2005—38 months of delay.

86.    Kos, however, was not finished listing patents in the Orange Book.  After listing the '967 patent in the Orange Book, Kos received notices from Barr that it had filed a Supplemental Paragraph IV Certification to each ANDA with respect to the '967 patent. On March 26, 2004, Kos filed its fourth patent infringement lawsuit against Barr in the SDNY

asserting infringement of this patent. On April 20, 2004 Barr answered the complaint by denying that the '967 patent is valid and infringed and seeking a declaratory judgment of invalidity and non-infringement. Barr also sought a declaratory judgment that the '715 patent is unenforceable due to inequitable conduct; a declaratory judgment that the '145, '181, '428, '715, and '930 patents are invalid; and a declaratory judgment that the '145, '181,'428, and '930 patents are not infringed. The fourth case was consolidated with the first three on May 10, 2004.

87.     After listing the '691 patent in the Orange Book, Kos received notices from Barr that Barr had filed a Supplemental Paragraph IV Certification to each ANDA with respect to the '691 patent. On September 3, 2004, after Kos did not sue Barr for infringing the '691 patent within the 45-day period but refused to give Barr a covenant not to sue, Barr filed a complaint seeking a declaratory judgment of invalidity of the '691 patent. On September 30, 2004, Kos answered the complaint by denying invalidity and counterclaiming for infringement and seeking a declaratory judgment of infringement. Barr replied on October 20, 2004 by denying infringement of any valid and enforceable claim of the patent. The fifth case was consolidated with the first four on September 21, 2004.

88.     Kos did not assert the '229 patent against Barr in the consolidated patent litigation, despite receiving a Paragraph IV notice from Barr certifying that the '229 patent is invalid, unenforceable or not infringed by Barr's generic Niaspan products.

89.     While those patent lawsuits were pending in New York, and while the 30-month stays were still in place, the FDA gave Barr "tentative approval" for its generic equivalent of Niaspan. This meant that, other than the 30-month Hatch-Waxman stay, Barr's products were approvable and ready for market. Barr received that tentative approval on May 9, 2003 (for its 1000mg product) and on June 13, 2003 (for its 500mg and 750mg products).  Barr expected to

(and did, in fact, receive) receive final approval from the FDA shortly after the last of the 30-month stays expired on March 30, 2005.

90.     The patent suits continued for more than two years without any substantive rulings on the merits of the patent claims.  On December 3, 2004, the court scheduled a trial for the consolidated cases for January of 2006.

91.     Absent the unlawful Agreement, neither the Niaspan patents, nor any of Kos' other patents, would have prevented Barr's entry in the market with a generic Niaspan product in Spring 2005.

   C.     **Barr Was Ready, Willing, and Able to Launch a Generic Equivalent of Niaspan "At-Risk" in The Spring of 2005.**

92.     As 2004 was drawing to a close, Barr was busily preparing to launch its generic equivalent of Niaspan shortly after the 30-month stay expired, but before the patent litigation was resolved. In the pharmaceutical industry, a generic launch before the resolution of the patent infringement litigation is called an "at-risk" launch because there exists a risk, however small, that the generic could be held liable for patent infringement damages. By Spring 2005, Barr was ready and willing, and would have been able to launch its generic extended-release niacin products as soon as FDA approved Barr's ANDAs.  None of the patents that Kos listed in the Orange Book as purportedly covering Niaspan, nor any other of Kos' patents, would have prevented Barr from launching its extended-release niacin in the Spring of 2005.

93.     Kos recognized the prospect of an at-risk launch by Barr as a growing competitive threat.  Kos acted swiftly in response to Barr's upcoming at-risk launch.

94.     Anticipating that the strength of its Niaspan patents would not prevent Barr from launching its generic Niaspan products at risk, Kos began preparing to launch its own authorized generic version of Niaspan.  Kos' authorized generic Niaspan products would have deprived Barr

of 180 days of exclusivity as the sole generic on the market, and would have replaced some of Kos' lost brand revenues with those from authorized generic sales. Kos began manufacturing its authorized generic version of Niaspan so that it would have inventory on hand to sell as soon as Barr launched. By the end of the first quarter of 2005, Kos had accumulated more than $1.3 million in inventory for its authorized generic launch. Kos was prepared to launch—and would have launched—an authorized generic version of Niaspan, if Barr had launched its extended-release niacin at-risk.

95.     In addition, on March 7, 2005, Kos moved to obtain a temporary restraining order and preliminary injunction prohibiting Barr from launching its generic Niaspan products following the expiration of the last 30-month stay on March 30, 2005.  At the time of the March 18, 2005 preliminary injunction hearing, Barr was ready to launch. Barr had accumulated sufficient inventory and was only awaiting FDA approval, which Barr expected to receive soon after the 30-month stay expired.  At the hearing, Kos emphasized that the entry of Barr's generic would be a "devastating event" to Kos, a company that derived 80% of its revenues from its two Niaspan-related products (Niaspan and Advicor).

96.     Opposing the injunction, Barr emphasized the strengths of its invalidity and non-infringement defenses and the importance of early entry of generic drugs.  Barr stated: "Our product has been withheld from consumers long enough. The 30-month stay will be over and at that point the [sic] Barr has its right if it chooses to launch its product to the benefit of consumers, including the poor and uninsured who depend on more affordable generic drugs."

97.     Barr further emphasized that the balance of equities disfavored the injunction because Barr's entry after the last of the 30-month stays was intended by Congress under the Hatch-Waxman Act:

> Judge . . . we are operating [sic] Hatch-Waxman amendment. It encourages generic competition. Why? Because our Congress, our society, drafters of the Hatch-Waxman amendment have all decided that generic competition is good. Why is it good? Because it gives lower prices to consumers which is particularly important to those who don't have insurance to those who are poor.  That is an awfully important factor.

98.     Rather than launch its generic Niaspan products at the end of the 30-month stays, however, Barr agreed to withhold the benefits of generic competition from consumers and other purchasers, including "those who don't have insurance" and "those who are poor," in exchange for a cut of Kos' monopoly profits.

99.     Moreover, to prevent generic entry using just the Niaspan patents (rather than payoffs) Kos would have had to defeat each of Barr's arguments regarding invalidity and unenforceability and prove that Barr infringed its patents.  Kos instead decided to protect its monopoly by paying Barr to withdraw its challenges to the validity and enforceability of the Niaspan patents and delay its introduction of generic Niaspan.  And that is precisely what it did, in concert with Barr.

### D.      Kos and Barr Enter the Exclusion Payment Agreement.

100.    On the day the last 30-month stay expired, March 30, 2005—before the court ruled on the merits of Kos' preliminary injunction motion—Kos and Barr announced that they had settled the patent litigation and asked the court to postpone its injunction ruling, so that they could formalize their settlement. The judge issued a conditional order of discontinuance dated March 30, 2005.

101.    On April 12, 2005, Kos and Barr formally entered the Exclusion Payment Agreement.  On the same day, and pursuant to the Exclusion Payment Agreement, the court dismissed the patent infringement cases that were pending between Barr and Kos regarding Niaspan.

102.     Under the Exclusion Payment Agreement, Barr agreed to: (a) drop its challenge to the asserted Niaspan patents; (b) delay launching its generic Niaspan products until September 20, 2013 (or such earlier time as may be required to preserve Barr's right to market a generic exclusively for 180 days); and (c) assist Kos in preventing all subsequent generic companies from entering the market until 2014.

103.     As the quid pro quo for Barr's agreement to drop its challenge to the Niaspan patents listed above and join its scheme to delay generic competition to Niaspan, Kos agreed, pursuant to the Agreement, to pay Barr tens of millions of dollars or more.  Kos' payments to Barr under the Exclusion Payment Agreement include multiple components.

104.     First, Kos agreed to pay and has paid Barr upfront and quarterly lump sum payments—but only for so long as Barr kept its generic Niaspan products off the market.  These lump sum fees were disguised as "stand-by" payments to compensate Barr for standing ready to manufacture Niaspan.  Under these payment provisions, Kos paid Barr an "upfront fee" of approximately $5 million upon signing the Exclusion Payment Agreement, which has been supplemented with additional "stand ready" payments every quarter since the Agreement was entered.

105.     Second, Kos agreed to pay and has paid Barr quarterly royalty payments on all of Kos' sales of Niaspan and Advicor (Kos' extended-release niacin/statin combination drug)—but only for so long as Barr kept its generic Niaspan products off the market.  Together, sales of Niaspan and Advicor accounted for 80% of Kos' entire sales revenue at the time of the Agreement.   These payments were disguised as compensation to Barr for co-promoting cholesterol drugs Niaspan and Advicor to obstetricians, gynecologists and other doctors specializing in women's health. The royalty that Kos paid to Barr was based upon overall sales of

Niaspan and Advicor, regardless of whether the sales were made by Barr's sales force.  In 2006, Kos paid Barr $45 million in royalty payments based on Kos' sales of Niaspan and Advicor, which was the "maximum annual royalty" for that calendar year.  In 2007, Kos paid Barr another $37 million, which was again the maximum allowable amount for that year.  Kos has continued to pay Barr annual royalties on its Niaspan and Advicor sales every year since the Exclusion Payment Agreement was entered.

106.   Third, Kos agreed to grant Barr a license to begin selling a generic equivalent of Advicor (Kos' Niaspan/statin combination drug), with that license beginning in 2013.  There was no pending patent litigation between Kos and Barr regarding Advicor.

107.   Fourth, Kos agreed not to launch an authorized generic version of Niaspan for at least Barr's 180-day exclusivity period.  Kos had been actively planning and poised to launch an authorized generic Niaspan product in advance of Barr's at risk launch. This no-authorized generic agreement constituted a substantial payment to Barr, which can expect to make approximately double the unit sales, at a much higher price, absent an authorized generic in the market.  These higher prices come at the expense of Plaintiff and the End-Payor Class.

108.   Although Kos' payments to Barr under the Agreement are characterized as an exclusive license and payments for Barr's performance of manufacturing and co-promotion services for Kos, those characterizations are pretextual.  In fact, the payments from Kos to Barr were for Barr's agreement to delay generic competition to Niaspan for more than eight years. Absent Barr's agreement to delay entry into the market with generic Niaspan, Kos would not have made the no authorized generic agreement, agreed to designate Barr as a back-up manufacturer or co-promoter of Niaspan, nor granted a license to Barr to sell generic Advicor,

and/or would not have agreed to the price and/or other terms that it did under those provisions of the Agreement.  Kos paid Barr for delayed market entry of generic Niaspan.

109.    Because the payments from Kos to Bar under the Agreement exceeded the profit Barr could make by launching its generic version, both parties stood to gain more by preserving the monopoly created by their agreement than by allowing generic entry to occur (even if that entry was by Barr).  As a result, Defendants structured the Agreement to reduce or eliminate the chance that any subsequent ANDA filer could launch a generic version of Niaspan and diminish the parties' shared monopoly profits before the date contemplated by their Agreement.

110.    First, Defendants designed and executed the terms of the Exclusion Payment Agreement to "park" Barr's 180-day exclusivity and create a "bottleneck" to impede the approval and launch of all subsequent generic Niaspan ANDAs until 180 days after Barr's September 20, 2013 launch.  The Agreement delayed the "commercial launch" trigger of Barr's first filer exclusivity from occurring until September 20, 2013, meaning that a subsequent generic filer could not obtain FDA approval for its generic Niaspan ANDA until 180 days after September 20, 2013 unless it could obtain a court decision of invalidity or non-infringement from which no appeal could be taken with respect to every patent to which Barr had filed a Paragraph IV certification.

111.    In addition, Defendants fortified the bottleneck by structuring the Agreement in a manner that would dissuade subsequent generics from incurring the expense involved in triggering the start of the 180-day period through a court decision. For instance, the Agreement permits Barr to launch immediately if a subsequent filer triggers its 180-day exclusivity (regardless of Barr's later agreed entry date absent such event). Defendants knew and intended that this provision would act as a deterrent to any generic company seeking to dislodge their

bottleneck. Defendants publicized the provision of the Agreement that allowed Barr to enter earlier if a subsequent generic triggered its exclusivity.

E.   **Abbott Acquires Kos And Directly Participates in the Unlawful Agreement to Suppress Generic Competition.**

112.   In November of 2006, Abbott proposed to acquire control of Kos through a tender offer transaction.  Abbott offered to pay Kos shareholders $78 per share, which represented a 56% premium on the open market share price of $50 per share.  At the time that Abbott made that offer, Kos' portfolio of products was heavily dependent on Niaspan, and Kos did not have very many products in development.  Thus, Niaspan (along with the above-described unlawful and ongoing agreements that were keeping Barr from launching a generic equivalent of Niaspan) was a central element of Abbott's valuation of Kos' business.

113.   Abbott's tender offer was successful, and Kos was merged into Abbott in December of 2006.  As Kos' successor, Abbott stepped into the shoes of Kos with respect to the ongoing unlawful agreements with Barr.  Barr continued to refrain from entering the market with a generic equivalent of Niaspan, agreeing to hold off until the agreed upon launch date on September 20, 2013, and Abbott continued to make the agreed-upon payments to Barr.  In this way, Abbott directly and independently continued the unlawful agreement to suppress generic competition for Niaspan.

114.   Upon the completion of the merger, Abbott joined the ongoing unlawful course of conduct — and joined the unlawful agreements, collusion and conspiracy — with respect to the suppression of generic competition for Niaspan.  Abbott did not withdraw from that conspiracy, and instead continued to directly participate in the conspiracy by making unlawful exclusion payments to Barr, and benefit from the conspiracy by enjoying monopoly profits as a result of suppressed generic competition.

115.    Abbott had even less need than Kos for the co-promotion services or backup supply arrangements that were the pretext for the payments under the Agreement. The Agreement was only valuable to Abbott because it continued to postpone Barr's launch of a generic equivalent of Niaspan, and Abbott was willing to continue to pay Barr for that ongoing suppression of generic competition.

116.    Because Abbott was a substantially larger enterprise than Kos was, Abbott was better able to exploit the market advantages created by the ongoing unlawful agreement to suppress generic competition.  After Abbott took over the Niaspan business, sales of Niaspan increased significantly.  Over the years, U.S. retail sales of Niaspan grew as follows:

| | |
|---|---|
| 2006 | $ 474 million |
| 2007 | $ 546 million |
| 2008 | $ 639 million |
| 2009 | $ 717 million |
| 2010 | $ 794 million |
| 2011 | $ 1.13 billion |
| 2012 | $ 1.03 billion |

### F.    Teva Acquires Barr and Continues the Unlawful Agreement to Suppress Generic Competition.

117.    On December 23, 2008, Barr became a wholly-owned subsidiary of Teva.  Teva continued to participate in the ongoing unlawful agreements that were then in place with Abbott. Teva continued to refrain from entering the market with a generic equivalent of Niaspan, agreeing to hold off until September 20, 2013, and Abbott continued to make the agreed-upon payments to Barr and/or Teva.

118.    As a result of its acquisition of Barr, Teva owns (either directly or indirectly) the first-filer rights held by Barr.  Accordingly, no other generic company will be able to launch a generic equivalent of Niaspan until Teva's 180-day exclusivity period expires. Assuming that

Teva launches a generic equivalent of Niaspan on September 20, 2013, no other generic company can introduce a generic equivalent of Niaspan until March of 2014.

119.    Upon the completion of its acquisition of Barr, Teva joined the ongoing unlawful course of conduct—and joined the unlawful agreements, collusion and conspiracy—with respect to the suppression of generic competition for Niaspan.   Teva did not withdraw from that conspiracy, and instead continued to directly participate in and benefit from the conspiracy by receiving unlawful exclusion payments in exchange for agreeing to delay entry of its generic Niaspan products.

**G.    Abbott Acts to Preserve the Unlawful Agreement to Suppress Generic Competition.**

120.    In furtherance of its agreement with Teva to eliminate competition for Niaspan, Abbott took additional steps to ensure that nothing happened to disrupt the agreement that Teva would not launch its generic until September of 2013.

121.    For example, Abbott knew that if another generic drug manufacturer could obtain a court decision that each of the patents to which Barr submitted a Paragraph IV certification was invalid or not infringed by its generic equivalent of Niaspan, then the unlawful scheme to inflate prices on Niaspan would have been cut short.   Defendants recognized this risk, and Abbott undertook to avoid such a disruption.

122.    To date, Abbott (and its successor AbbVie) has sued multiple generic manufacturers who have filed ANDAs with Paragraph IV certifications seeking to market

generic Niaspan before expiration of the Niaspan patents.[3]  In each case, however, Abbott has thus far prevented any of the generic companies from obtaining a court ruling that would trigger the start of Teva's 180-day exclusivity.  Abbott has managed to prevent a triggering event that would finally "un-park" the marketing exclusivity that prevents FDA from approving any subsequent ANDA by, inter alia: (a) settling such suits before the court could enter final judgments on the infringement, the validity or the enforceability of Abbott's patents; and/or (b) engaging in dilatory tactics designed to prevent a triggering court decision.

123.    Abbott's strategic and dilatory conduct in these lawsuits was—and is—part of and in furtherance of its ongoing unlawful agreement with Barr, and later with Teva directly, to suppress generic competition in the market for Niaspan.

### H.    Abbott Sells Niaspan to AbbVie, and AbbVie Continues the Unlawful Agreement to Suppress Generic Competition.

124.    In 2012, Abbott announced that it was spinning off most of its prescription drug business into a new company, AbbVie.  That spin-off became effective as of January 1, 2013.  AbbVie has stepped into the shoes of Abbott with respect to the ongoing unlawful agreements with Teva by directly and independently continuing the unlawful agreement with Teva, as successor to Barr.  Teva has continued to refrain from launching a generic equivalent of Niaspan, and AbbVie has continued to make the agreed-upon payments to Teva.

---

[3] *E.g., Abbott Labs. et al v. Lupin Ltd. et al.*, Docket No. (D. Del. Dkt. No. 09-cv-00152); *Abbott Labs. v. Sun Pharms. Indus. Ltd.* (D. Del. Dkt. No. 10-CV-112); *Abbott Labs. v. Sandoz, Inc.* (D. Del. Dkt. No. 10-CV-538); *Abbott Labs. v. Cadila Healthcare Ltd.* (D. Del. Dkt. No. 12-CV-0065); *Abbott Labs. v. Amneal Pharms. LLC* (D. Del Dkt. No. 12-CV-235); *Abbott Labs. v. Mylan, Inc.* (D. Del. Dkt. No. 12-CV-257); *Abbott Labs. v. Watson Labs., Inc.* (D. Del. Dkt. No. 12-CV-324); *Abbott Labs. v. Kremers Urban Pharms., Inc.* (D. Del. 12-CV-703); *Abbott Labs. v. Amneal Pharms. LLC* (D. Del. Dkt. No. 12-CV-1088); and *Abbott Labs. v. Watson Labs., Inc.* (D. Del. 12-CV-1409).

125.    Upon the transition of the Niaspan business from Abbott to AbbVie (which occurred on or about on January 1, 2013), AbbVie joined the ongoing unlawful course of conduct—and joined the unlawful agreements, collusion and conspiracy—with respect to the suppression of generic competition for Niaspan.  AbbVie did not withdraw from that conspiracy, and instead continued to participate in, and benefit from it.

**I.      The Unlawful Agreement to Suppress Generic Competition is Ongoing, and It Continues to Cause Injury.**

126.    As of today, there is still no generic equivalent of Niaspan on the market in the United States.  AbbVie continues to sell brand name Niaspan at artificially-inflated prices, and Plaintiff has been denied the lower prices that generic competition would have brought to the market.  This lack of generic competition is the direct result of the continuing unlawful agreement to suppress competition in the market; the agreement began in 2005, has continued ever since then, and will continue at least through the end of 2013.

127.    During the four-year period prior to the filing of this Complaint, the Defendants' unlawful conduct has been ongoing and the Plaintiff has continued to suffer injury every day that Defendants' unlawful Agreement not to compete has remained in place.  During the applicable limitations period, the Defendants have operated under an ongoing Agreement to suppress generic competition, and Plaintiff has been injured by the Defendants' conduct.

**J.      The Unlawful Agreement to Suppress Generic Competition Harms Competition, Injures the Plaintiff, and Causes Damages.**

128.    Barr's 1000mg generic Niaspan ANDA was in approvable condition as of May 9, 2003 and its 500mg and 750 mg generic Niaspan ANDA was in approvable condition as of June 13, 2003, when FDA issued tentative approval to the ANDAs for those dose strengths.  FDA issues tentative approval only when it determines that an ANDA would otherwise be ready for final approval but for the 30-month stay.

Case 2:13-cv-01977-JD   Document 1   Filed 04/15/13   Page 42 of 64

129.    But for Defendants' overarching, anticompetitive and ongoing scheme to delay generic Niaspan competition in the United States, a generic equivalent of Niaspan would have been available in the United States far earlier than September 20, 2013 (which is the first date that a generic product is likely to become available).  But for the anticompetitive, illegal and ongoing conduct described in this Complaint, generic Niaspan would have entered the market as early as March 31, 2005—after the last 30-month stay expired. After entering the Agreement, Barr disposed of and took write-downs on the generic Niaspan inventory it had planned to use in its at-risk launch—before it was bought off by Kos.

130.    Additionally, but for the illegal conduct described in the Complaint, Kos would have launched its own authorized generic Niaspan product by mid- 2005, resulting in additional price competition for Niaspan. Additional generic versions would have become available soon thereafter, and in any case, much sooner than the date to which their entry has been delayed by Defendants anticompetitive scheme, further reducing the price of extended-release once-daily niacin.  After entering the Agreement, Kos destroyed more than $1.3 million worth of inventory it had planned to use in its launch of authorized generic Niaspan—before it paid off Barr.

131.    Alternatively, but for the substantial payments Kos made to Barr in exchange for Barr's agreement to delay marketing its generic Niaspan products until September 20, 2013, Kos and Barr would have agreed to a licensed entry date significantly earlier than September 20, 2013.  Without the payments, which were the quid pro quo for the delay, and absent an at-risk launch, Barr would have insisted on earlier licensed entry.

132.    But for the anticompetitive, illegal and ongoing conduct alleged in this Complaint, Plaintiff and members of the Class would have begun to pay less for their extended-release niacin \requirements long ago.  As a result, Defendants, by their conduct, have injured

Plaintiff and the Class by causing them to pay substantial overcharges—potentially hundreds of millions of dollars—on their purchases of extended-release once-daily niacin.

## VII.   MARKET POWER AND MARKET DEFINITION

133.   At all relevant times, Kos, Abbott and AbbVie had the power to maintain the price of Niaspan products (meaning Niaspan in all its dosage strengths) at supracompetitive levels without losing substantial sales to other products. In fact, on several occasions, Kos reported that it was able to raise prices on Niaspan (even though costs were not increasing) while simultaneously increasing its sales volumes on the drug.

134.   A small but significant, non-transitory price increase for Niaspan would not have caused a significant loss of sales so as to make the higher prices unprofitable.

135.   Niaspan does not exhibit significant, positive cross-elasticity of demand with respect to price, with any product other than an AB-rated generic equivalent of Niaspan (which has never entered the market).

136.   Because of, among other reasons, its unique profile as a once-a-day extended-release niacin therapy for treating mixed lipid disorders, Niaspan is differentiated from all products other than AB-rated generic equivalents of Niaspan (which have never entered the market).

137.   Kos, Abbott and/or AbbVie needed to control only Niaspan (and any AB-rated generic equivalents for Niaspan), and no other products, in order to maintain the price of Niaspan profitably at supracompetitive prices.  Only the market entry of a competing, AB-rated generic equivalent of Niaspan would render Kos, Abbott, and AbbVie unable to profitably maintain supracompetitive prices of Niaspan without losing substantial sales.

138.   Kos, Abbott, and/or AbbVie also sold brand Niaspan at prices well in excess of marginal costs, and in excess of the competitive price, and enjoyed high profit margins.

139.    Kos, Abbott and/or AbbVie has had, and exercised, the power to exclude generic competition to brand Niaspan.

140.    Kos, Abbott and/or AbbVie, at all relevant times, enjoyed high barriers to entry with respect to the market for Niaspan products.

141.    To the extent that Plaintiff is legally required to define a relevant product market, Plaintiff alleges that the relevant market is all Niaspan products — i.e., extended-release niacin tablets (in all its dosage strengths) and AB-rated bioequivalent products.  During the period relevant to this case, Defendants have been able to profitably maintain the price of Niaspan well above competitive levels.

142.    The relevant geographic market is the United States and its territories.

143.    At all relevant times, Kos (and/or its successors Abbott and AbbVie) has had a 100% market share in the relevant market, and will continue to have that market share until September 20, 2013.  For the period from September 20, 2013 until March of 2014, Defendants will share a 100% market share in the relevant market.

## VIII.   MARKET EFFECTS AND DAMAGES TO THE CLASS

144.    Kos began to ship Niaspan to Plaintiff and other members of the Class on or shortly after July 28, 1997, after receiving the FDA's formal, written final approval of its NDA.  No generic equivalent of Niaspan has ever been available for sale in the United States.

145.    Defendants' anticompetitive scheme had the purpose and effect of restraining competition unreasonably and injuring competition by protecting Niaspan from generic competition. But for the anticompetitive, illegal and ongoing conduct described in this Complaint, at least two generic Niaspan products (Barr's and Kos') would have entered the market as early as March 31, 2005, and additional generic manufacturers would also have already entered the market.

146.     The Defendants' unlawful scheme allowed Kos (and later Abbott and AbbVie directly) to exclude competition in the market for Niaspan products, leading to higher prices paid by Plaintiff and all other members of the Class.

147.     But for the Defendants' illegal conduct, generic competition would have forced down the price of brand Niaspan, and price competition among the generic suppliers would have been intense.

148.     But for the Defendants' illegal conduct, Plaintiff and members of the Class would have paid less for Niaspan and/or extended-release niacin.  The Defendants' conduct directly injured Plaintiff and the Class by forcing them to pay hundreds of millions of dollars in overcharges on their Niaspan purchases.

149.     As a result of the delay in generic Niaspan competition brought about by the Defendants' overarching anticompetitive scheme, Plaintiff and the Class paid more for Niaspan products than they would have paid absent Defendants' illegal conduct.

150.     Barr, Teva and the other ANDA applicants seeking to market generic Niaspan had extensive experience in the pharmaceutical industry, including in obtaining approval for ANDAs, manufacturing commercial launch quantities adequate to meet market demand, marketing generic pharmaceutical products, and paying and receiving consideration for selective waiver and/or relinquishment of 180-day first-to-file marketing exclusivities.

151.     Upon generic entry, generic equivalents of brand drugs are priced significantly below the brand drug to which they are AB-rated.  As a result, upon generic entry, virtually all brand drug purchases are rapidly substituted for generic equivalents of the drug.  As more generic manufacturers enter the market, prices for a generic equivalent of a drug fall even further because of increasing price competition.

152.    This price competition enables all end-payor purchasers of the drugs to: (a) purchase generic equivalents of the drug at a substantially lower price than the brand; (b) purchase generic equivalents of the drug at a lower price; and/or (c) purchase the brand drug at a reduced price.  Consequently, brand drug manufacturers have a keen financial interest in delaying the onset of generic competition, and purchasers experience substantial cost inflation from that delay.

153.    If generic competitors had not been unlawfully prevented from entering the market for earlier and competing with Kos, Abbott and AbbVie, Plaintiff and members of the Class, would have paid less for Niaspan by (a) substituting purchases of less-expensive AB-rated generic equivalents of Niaspan for their purchases of more-expensive brand Niaspan, (b) purchasing generic equivalents of Niaspan at lower prices, and (c) purchasing brand Niaspan at a reduced price.

154.    Moreover, due to the Defendants' conduct, other generic manufacturers were discouraged from and/or delayed in developing generic equivalents of Niaspan.

155.    Thus, the Defendants' unlawful conduct deprived Plaintiff and the Class of the benefits of competition that the antitrust laws were designed to ensure.

## IX.    ANTITRUST IMPACT

156.    During the relevant period, Plaintiff and members of the Class purchased substantial amounts of Niaspan indirectly from Kos, Abbott and AbbVie. As a result of Defendants' illegal conduct, members of the Class were compelled to pay artificially inflated prices for their Niaspan requirements. Those prices were substantially greater than the prices that members of the Class would have paid absent the illegal conduct alleged herein, because Class members were deprived of the opportunity to purchase lower-priced generic equivalents of Niaspan.

157.    As a consequence, Plaintiff and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

158.    Defendants' efforts to restrain competition in the market for Niaspan have substantially affected interstate and foreign commerce.

159.    At all material times, Kos, Abbott and AbbVie manufactured, promoted, distributed, and sold substantial amounts of Niaspan in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States. The Defendants' anticompetitive conduct had substantial instrastate effects in every state of purchase in that, inter alia, retailers within each state were foreclosed from offering cheaper generic equivalents of Niaspan to purchasers within each state, which directly impacted and disrupted commerce for consumers and third-party payors within each state.

160.    At all material times, Defendants transmitted funds as well as contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Niaspan.

161.    General economic theory recognizes that any overcharge at a higher level of distribution generally results in higher prices at every level below. See Hovenkamp, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624. Professor Hovenkamp states that "[e]very person at every stage in the chain will be poorer" as a result of the anticompetitive price at the top. Professor Hovenkamp also acknowledges that "one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level."

162.    Further, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to end-payors. Wholesalers and retailers passed on the inflated prices of Niaspan to the Plaintiff and members of the Class.

163.    The Defendants' anticompetitive actions enabled Kos, Abbott and AbbVie to indirectly charge consumers and third-party payors prices in excess of what they otherwise would have been able to charge absent the Defendants' unlawful actions.

164.    The prices were inflated as a direct and foreseeable result of the Defendants' anticompetitive conduct.

165.    The inflated prices that the Class has paid are traceable to, and the foreseeable result of, the overcharges by Kos, Abbott and AbbVie.

## X.    INTERSTATE AND INTRASTATE COMMERCE

166.    At all material times, Kos and its successor companies manufactured, promoted, distributed, and sold substantial amounts of Niaspan in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

167.    At all material times, Defendants transmitted funds, as well as contracts, invoices and other forms of business communications and transactions, in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Niaspan and/or AB-rated bioequivalents.

168.    In furtherance of their efforts to restrain competition in the market for Niaspan and its generic equivalents, Defendants employed the United States mails and interstate and international telephone lines, as well as means of interstate and international travel.  Defendants' activities were within the flow of and have substantially affected interstate commerce.

169.    Defendants' anticompetitive conduct has substantial intrastate effects in that, inter alia, retailers within each state are foreclosed from offering less expensive generic Niaspan to end-payors inside each respective state.  The foreclosure of generic Niaspan directly impacts and disrupts commerce for end-payors within each state.

## XI.    FRAUDULENT CONCEALMENT

170.    Plaintiff and members of the Class had no knowledge of Defendants' unlawful self-concealing scheme and could not have discovered the scheme and conspiracy through the exercise of reasonable diligence more than four years prior to the filing of this Complaint.

171.    This is so both because the nature of Defendants' conspiracy was self-concealing and because Defendants employed deceptive practices and techniques of secrecy to avoid detection of, and to fraudulently conceal, their contract, combination, conspiracy, and scheme. Notwithstanding the self-concealing nature of their conspiracy, Defendants and their co-conspirators wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from Plaintiff by, among other things:

a. Concealing the amounts that Kos (and later Abbott and AbbVie) was to pay to Barr (and later Teva) under the Agreement;

b. Concealing the fact that those amounts far exceeded any lawful economic benefit that Kos (and later Abbott and AbbVie) received from Barr (and later Teva) under the Agreement;

c. Issuing a Joint Press Release on April 13, 2005 that claimed that those payments were compensation for Barr promoting Niaspan to obstetricians and gynecologists, and as compensation for Barr agreeing to stand by as a backup supplier, when in fact Kos was paying Barr not to launch a generic equivalent of Niaspan;

d.  In that same Joint Press Release, proclaiming that the Agreement would permit Barr to launch a generic equivalent to Niaspan in 2013, which was supposedly "approximately four years earlier than the last-to-expire Kos patent," without stating that Barr and Kos had planned to launch their respective generic Niaspan products upon the expiration of the 30-month stay on March 30, 2005;

e.  Repeating those false and misleading statements about the Agreement in publicly-filed documents (including Kos's 10-Q filing dated May 10, 2005 at p. 15; Kos's 10-Q filing dated August 9, 2005, at p. 24; Kos's 10-Q filing dated November 9, 2005, at p. 25; Kos 10-K filing dated March 10, 2006, at pp. 4, 26; Barr's 10-Q filing dated May 6, 2005, at pp. 18-19; and Barr's 10-K filing dated September 13, 2005);

f.  Repeating those same false and misleading statements in the Agreement (including ¶ 4 of the Co-Promotion Agreement; Article 7 of the License and Manufacturing Agreement; and the "Whereas" clauses of the Settlement and License Agreement);

g.  During conference calls with investment bank analysts, refusing to answer direct questions from analysts in the financial community who asked about the financial terms of the payments that Kos was making to Barr (including an April 13, 2005 Conference Call, in which Barr's Chief Executive Officer Bruce Downey refused to provide details when asked about the financial terms of the Agreement, and an August 4, 2005 Conference Call, in which Kos's Interim Chief Financial Officer Juan Rodriguez refused to provide details of those financial terms); and

h.  Filing redacted versions of the Agreement with the United States Securities and Exchange Commission (Submitted as Exhibits 10.2, 10.3 and 10.4 to Kos's 10-Q filing dated August 9, 2005), so as to conceal the financial terms of the Agreements.

172.  Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed.

173.  As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff's and the Class's claims have been tolled.

174.  Alternatively, if the statute of limitations is not tolled, this Complaint alleges a continuing course of unlawful conduct (including unlawful conduct within the limitations period), and Plaintiff and the members of the Class can recover for damages that they suffered during the limitations period.

## XII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**For Conspiracy and Combination in Restraint of Trade Under State Law
(Against All Defendants)**

175.  Plaintiff incorporates by reference the preceding allegations and paragraphs.

176.  In or about March 2005 and no later than April 12, 12005, Kos and Barr entered into the Exclusion Payment Agreement, a continuing illegal contract, combination and conspiracy in restraint of trade under which Kos agreement to pay Barr substantial consideration in exchange for Barr's agreement to delay bringing its generic Niaspan products to market.  The purposes and effect of the unlawful Agreement were to: (a) allocate 100% of all sales of Niaspan in the United States to Kos. Abbott and AbbVie until September 20, 2013; (b) prevent each of the

participating companies from selling a generic equivalent or version of Niaspan in the United States until September 20, 2013; (c) prevent other generic manufacturers from selling generic equivalents of Niaspan in the United States until 2014; and (d) fix the price that Plaintiff and members of the Class would pay for Niaspan and its generic equivalents at supracompetitive levels.

177.     The Agreement between Defendants is a horizontal market allocation and price fixing agreement between actual and potential competitors and is illegal *per se* under state antitrust laws. Alternatively, this Complaint alleges that the Agreement is an unreasonable restraint of trade, in violation of state antitrust law, under a "quick look" or "rule of reason" analysis.

178.     The purpose and effect of the payments flowing from Kos and its successors to Barr and its successors under the Agreement was to delay generic competition to Niaspan and there is no legitimate, nonpretextual, precompetitive business justification for the Exclusion Payments that outweighs their harmful effects.  Nor were the payments or market restraining Agreement terms beyond the exclusionary reach of the relevant patents necessary to achieving any conceivable procompetitive purpose.

179.     The Agreement harmed Plaintiff and the Class as set forth above.

180.     The Agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

181.     Each of the Defendants directly and independently participated in the unlawful conduct alleged herein.

182.    By engaging in the foregoing conduct, Defendants have intentionally and wrongfully engaged in a continuing combination and conspiracy in restraint of trade in violation of the following state laws:

a.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Arizona Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in Arizona by members of the Class.

b.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Cal. Bus. Code §§ 16700, *et seq.*, and Code §§ 17200, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in California by members of the Class.

c.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of D.C. Code Ann. §§ 28-45031, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in the District of Columbia by members of the Class.

d.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Fla. Stat. §§ 501. Part II, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in Florida by members of the Class, and this conduct constitutes a predicate act under the Florida Deceptive Practices Act.

e.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in Kansas by members of the Class.

f.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Me. Rev. Stat. Ann. 10, § 1101, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in Maine by members of the Class.

g.  Defendant have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Mass. Ann. Laws ch. 93, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in Massachusetts by members of the Class.

h.  Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Mich. Comp. Laws Ann. §§ 445.771, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in Michigan by members of the Class.

i.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Minn. Stat. §§ 325D.52, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in Minnesota by members of the Class.

j.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Miss. Code Ann. §§ 75-21-1, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in Mississippi by members of the Class.

k.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in Nebraska by members of the Class.

l.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in Nevada by members of the Class, in that thousands of sales of Niaspan took place at Nevada pharmacies, purchased by Nevada end-payors at supracompetitive prices caused by Defendants' conduct.

m.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in New Mexico by members of the Class.

n.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of New York General Business Law § 340, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in New York by members of the Class.

o.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in North Carolina by members of the Class.

p.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of N.D. Cent. Code § 51-08.1-01, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in North Dakota by members of the Class.

q.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in Oregon by members of the Class.

r.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of 10 L.P.R.A. § 258 with respect to purchases of Niaspan and AB-rated generic equivalents in Puerto Rico by members of the Class.

s.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of S.D. Codified Laws Ann. § 37-1, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in South Dakota by members of the Class.

t.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in Tennessee by members of the Class, in that the actions and transactions alleged herein substantially affected Tennessee, with thousands of end-payors in Tennessee paying substantially higher prices for Niaspan and AB-rated generic equivalents at Tennessee pharmacies.

u.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in Utah by members of the Class.

v.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Vt. Stat. Ann. 9, § 2453, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in Vermont by members of the Class.

w.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of W.Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in West Virginia by members of the Class.

x.   Defendants have intentionally and wrongfully engaged in a combination and conspiracy in restraint of trade in violation of Wis. Stat. § 133.01, *et seq.*, with respect to purchases of Niaspan and AB-rated generic equivalents in Wisconsin by members of the Class, in that the actions and transactions alleged herein substantially affected the people of Wisconsin, with thousands of end-payors in Wisconsin paying substantially higher price for Niaspan at Wisconsin pharmacies.

183.   Plaintiff and members of the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Claim. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced generic Niaspan products, and (2) paying higher prices for Niaspan products than they would have paid in the absence of Defendants'

conduct. These injuries are of the type the antitrust laws of the above States were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

184.    As successors in interest to Kos, Abbott and AbbVie are liable for all unlawful conduct committed by Kos during the relevant period, and are liable for all damages that resulted from Kos' unlawful conduct. And by joining an ongoing unlawful agreement to restrain trade, Abbott and AbbVie are liable for all conduct—and damages following from all conduct—that occurred prior to the date that they joined the ongoing unlawful course of conduct. In addition, Abbott and AbbVie are liable for all damages resulting from their own unlawful conduct.

185.    As a successor in interest to Barr, Teva is liable for all unlawful conduct committed by Barr during the relevant period, and is liable for all damages that resulted from Barr's unlawful conduct. And by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct—and damages following from all conduct—that occurred prior to the date that Teva joined the ongoing unlawful course of conduct. In addition, Teva is liable for all damages resulting from its own unlawful conduct.

186.    Plaintiff and the Class seek damages and multiple damages as permitted by law for their injuries by Defendants' violations.

187.    The Defendants are jointly and severally liable for all damages suffered by the Plaintiff and the members of the Class.

## SECOND CLAIM FOR RELIEF
### For Unfair And Deceptive Trade Practices Under State Law
### (Asserted Against All Defendants)

188.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

189.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed below.  As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiff and class members were deprived of the opportunity to purchase a generic version of Niaspan and forced to pay higher prices.  By engaging in the foregoing conduct, Defendants have violated the following state Unfair and Deceptive Trade Practices and Consumer Fraud laws:

a.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in Arizona by members of the Class.

b.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in California by members of the Class.

c.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in Florida by members of the Class.

d.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § *505/1, et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in Illinois by members of the Class.

e.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in Kansas by members of the Class.

f.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in Maine by members of the Class.

g.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in Massachusetts by members of the Class, with thousands of Massachusetts end-payors paying substantially higher prices for Niaspan and AB-rated bioequivalents in actions and transactions occurring substantially within Massachusetts.

h.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in Michigan by members of the Class.

i.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in Minnesota by members of the Class.

j.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in Nebraska by members of the Class.

k.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in Nevada by members of the Class.

l.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A: 1, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in New Hampshire by members of the Class.

m.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. § 57-12-1, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in New Mexico by members of the Class.

n.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in New York by members of the Class.

o.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in North Carolina by members of the Class.

p.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in South Dakota by members of the Class.

q.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in Tennessee by members of the Class.

r.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code § 13-11-1, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in Utah by members of the Class.

s.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. § 2451 *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in Vermont by members of the Class.

t.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of West Virginia Code § 46A-6-101, *et seq.*, with respect to purchases of Niaspan and AB-rated bioequivalents in West Virginia by members of the Class.

190.   Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' anticompetitive, unfair or deceptive acts alleged in this Claim. Their injury consists of paying higher prices for Niaspan and/or AB-rated bioequivalents than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

## THIRD CLAIM FOR RELIEF
### Unjust Enrichment
### (Against All Defendants)

191.   Plaintiff incorporate by reference the preceding allegations and paragraphs.

192.   Defendants have benefited from the overcharges on their sales of Niaspan resulting from the unlawful and inequitable acts alleged in this Complaint.

193.   Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to overpayments for Niaspan by Plaintiff and members of the Class.

194.   Plaintiff and the Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiff and the Class.

195.     It would be futile for Plaintiff and the Class to seek a remedy from any party with whom they had privity of contract. Defendants have paid no consideration to anyone for any benefits received indirectly from Plaintiff and the Class.

196.     It would be futile for Plaintiff and the Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Niaspan, as they are not liable and would not compensate Plaintiff for unlawful conduct caused by Defendants.

197.     The economic benefit derived by Defendants through charging supracompetitive and artificially inflated prices for Niaspan is a direct and proximate result of Defendants' unlawful practices.

198.     The financial benefits derived by Defendants rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anticompetitive prices during the Class Period, inuring to the benefit of Defendants.

199.     It would be inequitable under unjust enrichment principles under the laws of each of the States in the United States and the District of Columbia and Puerto Rico for the Defendants to be permitted to retain any of the overcharges for Niaspan derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

200.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiff and the Class.

201.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds received by them.

202.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff and the Class.

203.    Plaintiff and the Class have no adequate remedy at law.

204.    As successors in interest to Kos, Abbott and AbbVie are liable for all unlawful conduct committed by Kos during the relevant period, and are liable for all damages that resulted from Kos' unlawful conduct. And by joining an ongoing unlawful agreement to restrain trade, Abbott and AbbVie are liable for all conduct—and damages following from all conduct—that occurred prior to the date that they joined the ongoing unlawful course of conduct. In addition, Abbott and AbbVie are liable to all damages resulting from their own unlawful conduct.

205.    As a successor in interest to Barr, Teva is liable for all unlawful conduct committed by Barr during the relevant period, and is liable for all damages that resulted from Barr's unlawful conduct. And by joining an ongoing unlawful agreement to restrain trade, Teva is liable for all conduct—and damages following from all conduct—that occurred prior to the date that Teva joined the ongoing unlawful course of conduct. In addition, Teva is liable to all damages resulting from its own unlawful conduct.

**FOURTH CLAIM FOR RELIEF**
**Declaratory and Injunctive Relief Under Section 16 of the Clayton Act for Defendants'**
**Violations of Section 1 of the Sherman Act**
**(Against All Defendants)**

206.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

207.    Plaintiffs' allegations described herein and in the preceding Counts comprise violations of Section 1 of the Sherman Act, in addition to the state laws supra.

208.    Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a) hereby seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described herein violates Section 1 of the Sherman Act.

209.    Plaintiff and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by the unlawful conduct of Defendants, and other relief so as to assure that similar anticompetitive conduct does not reoccur in the future.

## XIII.   DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff, on behalf of itself and the Class, demands judgment for the following relief:

A.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class, and declare that the Plaintiff is a proper representative of the Class;

B.    Declare that the conduct alleged herein is in violation of Section 1 of the Sherman Act, of the other statutes set forth above, and of the common law of each of the States and the District of Columbia and Puerto Rico;

C.    Enjoin Defendants from continuing the illegal activities alleged herein;

D.    Enter joint and several judgments against Defendants in favor of Plaintiff and the Class;

E.    Grant Plaintiff and the Class equitable relief in the nature of disgorgement, restitution, and the creation of a construction trust to remedy Defendants' unjust enrichment;

F.    Award the Class damages and, where applicable, treble, multiple, punitive, and/or other damages, in an amount to be determined at trial, including interest;

G.      Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

H.      Grant such other further relief as is necessary to correct for the anticompetitive market effects caused by the unlawful conduct of Defendants, and as the Court deems just.

## XIV.   JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff, on behalf of itself and the proposed Class, demands a trial by jury on all issues so triable.

Dated:  April 12, 2013                              Respectfully Submitted,

By: s/Natalie Finkelman Bennett
Natalie Finkelman Bennett
James C. Shah
Eric L. Young
SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
35 East Main Street
Media, PA  19063
Telephone: 610-891-9880
Facsimile: 610-891-9883
Email:  nfinkelman@sfmslaw.com
            jshah@sfmslaw.com
            elyoung@sfmslaw.com

Steve D. Shadowen
HILLIARD & SHADOWEN LLC
39 West Main Street
Mechanicsburg, PA  17055
Telephone:  1-855-344-3298
Email: steve@hilliardshadowenlaw.com

Anne Fornecker
HILLIARD & SHADOWEN LLC
106 East 6th Street, Suite 900
Austin, Texas  78701
Telephone: 512-322-5339
Email: anne@hilliardshadowenlaw.com

Rose F. Luzon
SHEPHERD, FINKELMAN, MILLER
& SHAH, LLP
401 West A Street
Suite 2350
San Diego, California  92101
Telephone: 619-235-2416
Email: rluzon@sfmslaw.com

Richard L. Coffman, Esq.
THE COFFMAN LAW FIRM
First City Building
505 Orleans St., Ste. 505
Beaumont, TX 77701
Telephone:  (409) 833-7700
Facsimile:  (866) 835-8250 Fax
Email: rcoffman@coffmanlawfirm.com